UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| AMBER STRIPLIN, individually and as representative of a class of similarly situated persons, and on behalf of STIFEL FINANCIAL PROFIT SHARING 401(K) PLAN,<br><br>     Plaintiff,<br><br> v.<br><br>STIFEL FINANCIAL CORP., THE BOARD OF DIRECTORS OF STIFEL FINANCIAL CORP. and its members, STIFEL FINANCIAL PROFIT SHARING PLAN 401(K) INVESTMENT COMMITTEE and its members, and DOES 1-20 and DOES 21-40,<br><br>     Defendants. | Case No. 4:26-cv-255<br><br>JURY TRIAL DEMANDED |

## <u>COMPLAINT</u>

1. Plaintiff Amber Striplin ("Plaintiff"), by and through her attorneys, on behalf of the Stifel Financial Profit Sharing 401(k) Plan (the "Plan") and all others similarly situated, state and allege as follows:

### I. INTRODUCTION

2. Plaintiff brings this action under 29 U.S.C. § 1132(a)(2) on behalf of the Plan and the Plan's participants and beneficiaries against Defendants Stifel Financial Corp. ("Stifel"); the Stifel Financial Profit Sharing Plan 401(k) Investment Committee (the "Investment Committee" or "Committee"); members of the Stifel Investment Committee; the Stifel Board of Directors; and

1

members of the Stifel Board of Directors (collectively, "Defendants," "Stifel," or "Stifel Defendants") for breach of fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 ("ERISA").

3.      The Stifel Defendants are fiduciaries of the Plan and breached their duty to the Plan.

4.      As fiduciaries, the Stifel Defendants have an obligation to prudently select and monitor a menu of investment options for the Plan. They must continually assess those investment options and remove ones that become imprudent.

5.      The Stifel Defendants' conduct has not been prudent. Rather than acting with a singular focus on the needs of the Plan's participants and beneficiaries, the Defendants ignored poor investment performance. In doing so, the Defendants violated ERISA.

6.      Instead of funding secure retirements for loyal workers, Stifel inexplicably wasted Plan participants' 401(k) assets on investments with lackluster performance.

7.      The Stifel Defendants' years-long mismanagement directly impacts thousands of rank-and-file employees who have collectively lost tens of millions of dollars they and their families counted on to go into their golden years.

8.      Under ERISA, this Court has the power to hold the Stifel Defendants accountable and restore these workers' retirement assets.

## II.     OVERVIEW OF CLAIMS

9.      The Stifel Defendants' harm to the Plan arises from a failure to prudently monitor and remove two of the Plan's investment options: the American Century Large Cap Growth Pooled Account (the "American Century Large Cap Growth Fund" or "American Century Fund") and the Artisan Mid-Cap Growth Pooled Account (the "Artisan Mid-Cap Growth Fund" or "Artisan Fund") (collectively, the "Challenged Funds"). Both were added to the Plan in 2014.

A.      **American Century Large Cap Growth Fund**

10.     Since its beginning in 2001, the American Century Fund's investment performance has failed miserably against the benchmark that American Century Investments, Inc. ("American Century Investments")[1] "considers to be more representative of the fund's investment strategy," the Russell 1000 Growth Index (the "Russell 1000 Growth Index" or "Russell 1000 Growth").[2] The administrator of the American Century Fund, Empower Retirement, LLC, also identifies the Russell 1000 Growth as the primary benchmark.

11.     Since its inception in 2001 through January 31, 2026, the American Century Fund has underperformed the Russell 1000 Growth by 256 percentage points (821% versus 565%), or about 1.41% per year.

12.     Annual underperformance of 1.41% can torpedo a participant's retirement savings. For example, a 35-year-old participant with $100,000 in retirement savings will see that grow to

---

[1] American Century Investments is an investment adviser that manages multiple investment accounts (e.g., funds, pooled separate accounts) with a large-cap growth investment strategy. The American Century Fund offered in the Plan as an investment option is available under a group variable annuity contract issued by Empower Annuity Insurance Company of America ("Empower"). Empower offers this American Century Large Cap Growth strategy in multiple variable annuity contracts. Plaintiff does not have knowledge with respect to which exact Empower variable annuity account the Plan offers. For purposes of this Complaint, Plaintiff uses the investment performance of the Empower Insurance Plus-Large Cap Growth/American Century variable annuity. Relying on the Plan's documents, Plaintiff believes this account's investment performance closely tracks the investment performance of the variable annuity account offered by the Plan. For analytical purposes, the Court can treat these two variable annuity accounts as the same: both anchor back to the performance of the American Century Fund.

[2] The Russell 1000 Growth is independently maintained by Financial Times Stock Exchange ("FTSE"), a wholly owned subsidiary of the London Stock Exchange Group. FTSE is a leading global provider of benchmarking, analytics, and data solutions for investors with over 30 years in the business. The Russell 1000 Growth measures the performance of the large-cap growth segment of the U.S. stock market. It includes those Russell 1000 companies with relatively higher price-to-book ratios, higher forecast medium-term growth, and higher sales-per-share historical growth (i.e., growth companies).

3

$761,000 by retirement age, assuming a 7% return and no further contributions or withdrawals. However, that same $100,000 with a lower investment return of 5.60% will grow to only $512,000.

13.     From its inception in 2001 to its selection into the Plan in 2014, the American Century Fund did poorly. The investment performance of the Russell 1000 Growth more than doubled that of the American Century Fund (47% versus 23%). Annualized underperformance was approximately 1.5%.

14.     Tables 1.a, 1.b, and 1.c in Section X illustrate the American Century Fund's poor investment performance since 2014 relative to the Russell 1000 Growth and four large-cap growth funds that share similar aims, risks, and potential rewards.

15.     In the six-year period leading up to February 29, 2020, the cumulative investment performance of the American Century Fund again lagged the Russell 1000 Growth, this time by 6.5 percentage points (113% versus 106.5%). Average annualized underperformance was .57%, which would cost the 35-year-old participant presented in ¶ 9 over $112,000 in retirement savings over a 30-year career.

16.     From March 1, 2020, through January 31, 2026, the American Century Fund underperformed Russell 1000 Growth by nearly 30 percentage points or 2.2% on average year by year.

**B.     Artisan Mid-Cap Growth Fund**

17.     Since its introduction to the Plan in 2014, the Artisan Fund has underperformed its primary benchmark, the Russell Mid-Cap Growth Index (the "Russell Mid-Cap Growth Index" or

"Russell Mid-Cap Growth"),[3] by 42 percentage points (217% versus 259%), or 1% every year on average.[4]

18.    Tables 2.a, 2.b, and 2.c. in Section X illustrate the Artisan Fund's poor investment performance since 2014 relative to the Russell Mid-Cap Growth and three mid-cap growth funds that share similar aims, risks, and potential rewards.

19.    In the six-year period from 2014 to 2020, the Artisan Fund underperformed the Russell Mid-Cap Growth by about 8.5 percentage points (73.5% versus 82%). Average annualized underperformance was 0.85%, which would have cost the investor presented in ¶ 9 almost $162,000 over a 30-year career.

20.    From March 1, 2020, through January 31, 2026, the Artisan Fund again underperformed the Russell Mid-Cap Growth by 14.4 percentage points or about 1.4% each year on average.

---

[3] The Russell Mid-Cap Growth is independently maintained by the FTSE, a wholly-owned subsidiary of the London Stock Exchange Group. The Russell Mid-Cap Growth measures the performance of U.S. mid-cap companies with higher price/book ratios and forecasted growth values. As it notes, the Russell Mid-Cap Growth is constructed to provide a comprehensive and unbiased barometer of the mid-cap growth market. The index is completely reconstituted annually to ensure larger stocks do not distort the performance and characteristics of the true mid-cap growth market.

[4] Artisan Partners Asset Management Inc. ("Artisan Partners") is an investment adviser that manages multiple investment accounts (e.g., funds, pooled separate accounts) with a mid-cap growth investment strategy. The Artisan Fund offered in the Plan as an investment option is available under a group variable annuity contract issued by Empower. Empower offers this Artisan Mid-Cap Growth strategy in multiple variable annuity contracts. Plaintiff does not have knowledge with respect to which exact Empower variable annuity account the Plan offers. For purposes of this Complaint, Plaintiff uses the investment performance of the Empower Insurance Plus-Mid-Cap Growth/Artisan variable annuity. Relying on the Plan's documents, Plaintiff believes this account's investment performance closely tracks the investment performance of the variable annuity account offered by the Plan. For analytical purposes, the Court can treat these two variable annuity accounts as the same: both anchor back to the performance of the Artisan Fund.

C.    **Overall Claims**

21.    Defendants' retention of the Challenged Funds has had a large, tangible impact on the Plan and its employees' retirement savings. Both have suffered poor investment performance since 2014. Combined, the poor investment performance of the Challenged Funds has cost the Plan and its participants between approximately $42,000,000 and $134,000,000 in retirement savings since March 1, 2020.

22.    To remedy Stifel's breach of fiduciary duty, Plaintiff brings this action on behalf of the Plan, its participants, and their beneficiaries under 29 U.S.C. § 1132(a)(2) to enforce the Stifel Defendants' personal liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty occurring during the class period, which is from February 20, 2020, through the date of judgment (the "Class Period"). In addition, Plaintiff seeks for the Plan such other Plan-wide equitable or remedial relief as the Court may deem appropriate.

23.    Plaintiff did not have knowledge of all material facts (including, among other things, comparisons of the Plan's investment performance relative to other available investment alternatives) necessary to understand that the Stifel Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before filing this Complaint. Further, Plaintiff does not have actual knowledge of the specifics of the Stifel Defendants' decision-making processes with respect to the Plan, including the Stifel Defendants' processes for monitoring and removing Plan investments, because this information is solely within the possession of the Stifel Defendants prior to discovery. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

### III.    PARTIES

#### A.    Plaintiff

24.    Plaintiff Amber Striplin brings this suit in a representative capacity on behalf of the Plan and its participants and beneficiaries pursuant to 29 U.S.C. § 1132(a), seeking appropriate relief under 29 U.S.C § 1109 to protect the interests of the Plan. Plaintiff Striplin is a participant in the Plan, as defined in 29 U.S.C. § 1002(7), during the Class Period. Plaintiff Striplin suffered individual injury by investing in the American Century Fund.

#### B.    Defendants

25.    Stifel is headquartered in St. Louis, Missouri, and is a multinational independent investment bank and financial services company. Stifel is the Plan sponsor. Stifel acts through its Board of Directors.

26.    The Plan is administered by the Stifel Financial Profit Sharing Plan 401(k) Investment Committee. Current and former members of the Committee are fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A) because they exercise discretionary authority and/or discretionary control respecting management of the Plan.

27.    Members of the Stifel Board of Directors appoint members of the Stifel Investment Committee.

28.    Plaintiff is currently unaware of the identities of the individual members of the Investment Committee during the Class Period. Accordingly, those individuals are collectively named Defendants Does 1-20. Further, Plaintiff is not currently aware of the identities of the individual members of the Board of Directors to whom the Board of Directors delegated responsibility with respect to the Investment Committee and the Plan. Accordingly, those individuals are collectively named Defendants Does 21-40. Plaintiff will substitute the real names of the Does when they become known to Plaintiff. To the extent the Defendants delegated any of

7

their fiduciary functions to another person or entity, the nature and extent of which has not been disclosed to Plaintiff, the person or entity to which the function was delegated is also a fiduciary under 29 U.S.C. § 1002(21)(A) and thus alleged to be a Doe Defendant.

## IV.    JURISDICTION, VENUE, AND STANDING

29.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2).

30.    This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District in which the subject Plan is administered and where at least one of the alleged breaches took place. It is also the District in which the Stifel Defendants reside.

31.    As a participant in the Plan and holder of the American Century Fund, Plaintiff has standing to bring claims on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2), and she is a participant seeking appropriate Plan-wide relief under 29 U.S.C. § 1109. Thus, Plaintiff brings this suit under § 1132(a)(2) in a representative capacity on behalf of the Plan as a whole and seeks remedies under § 1109 to protect the Plan.

## V.    ERISA'S FIDUCIARY STANDARDS

### A.    Overview of ERISA's Fiduciary Duty of Prudence

32.    ERISA's fiduciary duties are "the highest known to the law." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (en banc) (internal quotation marks omitted). ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B).

33.     Accordingly, even in a defined contribution plan in which participants choose their investments, plan fiduciaries must conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of investment options.

34.     As part of its fiduciary duty, Stifel "has a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). That "continuing duty" exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Id.* "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* at 530. If an investment is imprudent, Stifel "must dispose of it within a reasonable time." *Id.* (citation omitted).

**B.      Fiduciary Liability Under ERISA**

35.     Under 29 U.S.C. § 1109, fiduciaries to the Plan are personally liable to make good to the Plan any harm caused by their breaches of fiduciary duty. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to *such plan* any losses to the plan resulting from each such breach, and to restore to *such plan* any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

*Id.* (emphasis added).

36.     29 U.S.C. § 1132(a)(2) is the enforcement mechanism of 29 U.S.C. § 1109. It enables participants and beneficiaries to bring civil actions to seek appropriate relief under 29 U.S.C. § 1109.

### C.    Co-Fiduciary Liability Under ERISA

37.    ERISA provides for co-fiduciary liability where a fiduciary knowingly participates in, or knowingly fails to cure, a breach by another fiduciary. Specifically, under 29 U.S.C. § 1105(a), a fiduciary shall be liable for a breach of fiduciary duty by a co-fiduciary if:

    i.    he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

    ii.    by his failure to comply with [29 U.S.C. § 1104(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

    iii.    he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## VI.    THE PLAN

38.    The Stifel Financial Profit Sharing 401(k) Plan is a profit-sharing plan as described in Section 401(k) of the Internal Revenue Code, I.R.C. § 401(k), 26 U.S.C. § 401(k) (1986) (hereinafter denoted as the "Code") and is subject to the provisions of ERISA. The plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a). Stifel is the sponsor of the Plan.

39.    During the Class Period, the Plan provided for retirement income for over 10,000 Stifel employees, former employees, and their beneficiaries (the "Plan participants"). Defendants exclusively controlled the selection and retention of the Plan's investment options. Participants' retirement account balances primarily depend on contributions they made to their accounts, Stifel's matching contributions, and the investment performance (net of fees and expenses) of the Plan's investment options.

40.     As of December 31, 2024, Plan participants had invested over $2,300,000,000 in the Plan. Nearly $160,000,000 in the Plan—or about 7%—was invested in the American Century Fund, and over $73,000,000 in the Plan—or about 3%—was invested in the Artisan Fund.

## VII.    OVERVIEW OF INVESTMENT FUNDS

41.     An investment fund (such as a mutual fund, collective investment trust, or pooled account) is a pool of money contributed by a group of investors with similar investment objectives. The investment adviser takes this pool of money and invests in different stocks on behalf of all investors in the fund. The investment adviser manages the investments in each fund in accordance with the investment objectives and strategies set forth in each fund's investment guidelines. For providing this service, the investment adviser charges the fund an investment advisory fee.

### A.    Active vs. Passive Management

42.     Funds can either be actively managed or passively managed. Actively managed funds rely on the professional judgment of their investment advisers to make decisions about the funds' portfolios of investments.

43.     For actively managed funds, a portfolio management team decides which industries they wish to allocate assets to, as well as what stocks to buy and sell and when. The fund pays the investment adviser a fee for these services—a fee which the fund passes on to their investors.

44.     The investment adviser's primary focus should be to outperform the benchmark it selects for the fund. There are a variety of benchmarks; the S&P 500 Index, the Russell 1000 Growth Index, and the Russell Mid-Cap Growth Index are three examples. An investment adviser charges fees for active management on the premise that its portfolio management team can pick a mix of stocks that beat its benchmark.

45.     Investment research and analysis typically drive the investment decisions of actively managed funds. Factors that an investment adviser may consider include, but are not

11

limited to, market trends, a company's financial condition, perceived risk of investing in the company, industry and sector outlook, and the underlying stocks' performances in various market conditions. Based on their respective professional judgment, one investment adviser may like manufacturing stocks while another may like bioscience stocks, while a third may like stocks whose issuers focus on financial services.

46.    Without variations between portfolio holdings, all funds would own identical investment portfolios and have nearly identical investment performance. Active management offers investors the opportunity to earn superior returns through the astute selection of investments. Astute selection typically drives superior investment performance over time and distinguishes the better-performing funds from the underperforming ones. Bad asset allocation and poor investment selection generally drive long-term underperformance.

47.    Active managers run the risk that their methods and analyses, including models, tools, and data, may be flawed or incorrect and may not achieve the fund's aim of beating its benchmark.

48.    Market research suggests that most active managers fail to beat their benchmarks. Given that active managers are paid to beat their benchmark, persistent underperformance is a red flag that suggests investors are not getting their money's worth and should consider other investment options.

49.    Actively managed funds stand in contrast to passively managed funds, or index funds, whose objective is to replicate the holdings and investment performance of a designated benchmark. Other than constructing a portfolio that tracks that of the benchmark, the portfolio management team makes few investment decisions for an index fund. Compared to actively

12

managed funds, the fees for index funds are significantly lower. Vanguard is a well-known leader in the index fund space.

50.     The American Century Fund is an actively managed fund. American Century Investments, the fund's investment adviser and entity most knowledgeable about this fund, identifies the Russell 1000 Growth as the fund's benchmark.

51.     The Artisan Fund is an actively managed fund. Artisan Partners, the fund's investment adviser and entity most knowledgeable about this fund, identifies the Russell Mid-Cap Growth as one of the benchmarks for the Artisan Fund.

**B.      Investment Aims of Large-Cap and Mid-Cap Growth Funds**

52.     The American Century Fund is a large-cap growth fund. The stocks of the biggest companies typically dominate these funds. The principal aim of large-cap growth funds is to provide investors with long-term growth of capital.

53.     The Artisan Fund is a mid-cap growth fund. The stocks of companies in the middle range of publicly traded companies typically dominate these funds. Mid-cap or mid-sized companies fall somewhere between $2,000,000,000 to $10,000,000,000 in market capitalization. The principal aim of mid-cap growth funds is to provide investors with long-term growth of capital.

54.     The American Century Fund and the Artisan Fund both have a growth style. Funds with a growth style invest in stocks of companies that are projected to grow faster than other stocks. Growth is defined based on fast growth (high growth rates for earnings, sales, book value, and cash flow) and high valuations (high price ratios and low dividend yields).

**C.      Investment Risks of Large-Cap and Mid-Cap Growth Funds**

55.     The principal categories of risks for funds that invest in stocks, like the Challenged Funds, include market risk, issuer risk, and the risk of investing in growth-oriented stocks, and, for the Artisan Fund, the risk of investing in mid-cap stocks.

13

56.     Market risk is the chance that stock prices overall will decline. Stock markets tend to move in cycles, with periods of rising prices and periods of falling prices, so each fund is subject to the risk that the market as a whole will fall.

57.     Issuer risk is the chance that prices of, and the income generated by, individual securities of companies held by the fund (e.g., Ameren) may decline in response to various factors directly related to the issuers of such securities, including reduced demand for an issuer's goods or services, poor management performance, major litigation, investigations, or other controversies related to the issuer.

58.     The issuer risk for a mid-cap fund is considered greater than that of a large-cap fund (e.g., the American Century Fund) because a mid-cap fund invests in smaller companies. Smaller companies may have limited financial resources, product lines and markets, and their securities may trade less frequently and in more limited volumes than the securities of larger companies, which could lead to greater volatility and higher transaction costs.

59.     Investing in growth-oriented stocks also carries risk. Such stocks (e.g., Tesla) may experience larger price swings and greater potential for loss than other types of stocks, such as those that are considered value-oriented or those that historically have paid continuous dividends (e.g., Bristol Myers).

**D.      Potential Investment Rewards of Actively Managed Large-Cap and Mid-Cap Growth Funds: Fiduciaries Select Benchmarks to Evaluate Achievement of Potential Rewards**

60.     Typically, investors want a portfolio that consists of investments that track or exceed their respective benchmarks. Whether an investment performs well relative to its benchmark is concrete rather than abstract.

14

61.     For an actively managed investment fund, the potential reward is that the fund will deliver positive investment returns that exceed those of its benchmark. Investment advisers select benchmarks that they believe have similar aims, risks, and potential rewards as those of their fund.

62.     The American Century Fund's investment adviser, American Century Investments, and the fund's administrator, Empower Retirement, LLC, identify the Russell 1000 Growth as the benchmark.

63.     The Artisan Fund's investment adviser, Artisan Partners, and the fund's administrator, Empower Retirement LLC, identify the Russell Mid-Cap Growth as the benchmark.

## VIII.    THE AMERICAN CENTURY FUND AND ITS COMPARATORS AND BENCHMARK

### A.      American Century Fund

64.     The American Century Fund's aim is to seek long-term growth of capital.

65.     The American Century Fund pursues its aim by investing primarily in large U.S. companies with growth characteristics (i.e., growth companies).

66.     American Century Investments notes in its prospectus that it considers the Russell 1000 Growth to be more representative of the American Century Fund's investment strategy.

67.     American Century Investments and Morningstar, Inc. ("Morningstar") classify the American Century Fund as a large-cap growth fund.[5]

68.     Currently, approximately 90% of the American Century Fund's portfolio is invested in large-cap stocks. Its top holdings include NVIDIA, Microsoft, Apple, Amazon, and Broadcom.

---

[5] Morningstar asserts that it is the leading provider of investment research products (e.g., data and research insights on managed investment products, publicly listed companies, and private capital markets). It is relied upon by individual investors, financial advisers, asset managers, retirement plan providers and sponsors, and institutional investors in the private capital markets in North America, Europe, Australia, and Asia.

69.     The American Century Fund's potential rewards are that it will generate positive investment returns that outperform the Russell 1000 Growth. The American Century Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

70.     By investing a significant portion of its assets in stocks, including growth-oriented stocks, the American Century Fund is considered as having a very aggressive risk profile.

71.     The American Century Fund is not the only large-cap growth fund on the market with the same mix of aims, risks, and potential rewards as described above. As set forth below, numerous substantially similar funds have existed throughout the Class Period.

### i.     Comparator 1: JPMorgan Large Cap Growth Fund

72.     The JPMorgan Large Cap Growth Fund (the "JPMorgan Fund") has similar aims, risks, and potential rewards to those of the American Century Fund.

73.     Like the American Century Fund, the JPMorgan Fund is an actively managed large-cap growth fund that invests in large-cap companies with growth characteristics. Like the American Century Fund, the JPMorgan Fund is available in variable annuity products.

74.     The JPMorgan Fund's aim is to seek long-term capital appreciation. The JPMorgan Fund pursues its aim by investing primarily in large-cap companies with growth characteristics.

75.     Like the American Century Fund, the JPMorgan Fund identifies the Russell 1000 Growth as one of its benchmarks.

76.     Currently, approximately 93% of the JPMorgan Fund's portfolio is invested in large-cap stocks. Like the American Century Fund, the JPMorgan Fund's top holdings include NVIDIA, Microsoft, Apple, and Broadcom.

77. The JPMorgan Fund's potential rewards are that the fund will generate positive investment returns that outperform the Russell 1000 Growth. The JPMorgan Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

78. By investing a significant portion of its assets in stocks, including growth-oriented stocks, the JPMorgan Fund, like the American Century Fund, is considered as having a very aggressive risk profile.

79. The aims, risks, and potential rewards of the JPMorgan Fund are similar to those of the American Century Fund given the similarities in the two funds' investment strategies, the types of stocks the two funds own, and their very aggressive risk profiles.

80. Moreover, both funds are actively managed investment options that seek to outperform the same benchmark, the Russell 1000 Growth. These facts make the JPMorgan Fund a meaningful comparator to the American Century Fund.

### ii. Comparator 2: Fidelity Blue Chip Growth Fund

81. The Fidelity Blue Chip Growth Fund (the "Fidelity Blue Chip Fund") has similar aims, risks, and potential rewards to those of the American Century Fund.

82. Like the American Century Fund, the Fidelity Blue Chip Fund is an actively managed large-cap growth fund. Like the American Century Fund, the Fidelity Blue Chip Fund is available in variable annuity products.

83. The Fidelity Blue Chip Fund's aim is to seek capital appreciation. Like the American Century Fund, the Fidelity Blue Chip Fund pursues its aim by investing in large-cap companies with growth characteristics.

84.     Like the American Century Fund, the Fidelity Blue Chip Fund identifies the Russell 1000 Growth as one of its benchmarks.

85.     Fidelity Investments and Morningstar classify the Fidelity Blue Chip Fund as a large-cap growth fund. Currently, approximately 84% of the Fidelity Blue Chip Fund's portfolio is invested in large-cap stocks. Like the American Century Fund, the Fidelity Blue Chip Fund's top holdings include NVIDIA, Apple, Amazon, and Microsoft.

86.     The Fidelity Blue Chip Fund's potential rewards are that the fund will generate positive investment returns that outperform the Russell 1000 Growth. The Fidelity Blue Chip Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

87.     By investing a significant portion of its assets in stocks, including growth-oriented stocks, the Fidelity Blue Chip Fund, like the American Century Fund, is considered as having a very aggressive risk profile.

88.     The aims, risks, and potential rewards of the Fidelity Blue Chip Fund are similar to those of the American Century Fund given the similarities in the two funds' investment strategies, the types of stocks the two funds own, and their very aggressive risk profiles.

89.     Moreover, both funds are actively managed investment options that seek to outperform relative to the same benchmark, the Russell 1000 Growth. These facts make the Fidelity Blue Chip Fund a meaningful comparator to the American Century Fund.

### iii.     Comparator 3: Alger Focus Equity Fund

90.     The Alger Focus Equity Fund (the "Alger Fund") has similar aims, risks, and potential rewards to those of the American Century Fund.

18

91.     Like the American Century Fund, the Alger Fund is an actively managed large-cap growth fund. Like the American Century Fund, the Alger Fund is available in variable annuity products.

92.     The aim of the Alger Fund is to generate long-term capital appreciation. Like the American Century Fund, the Alger Fund pursues its aim by investing assets in common stocks of large companies with growth characteristics.

93.     Like the American Century Fund, the Alger Fund identifies the Russell 1000 Growth as one of its benchmarks.

94.     Fred Alger Management, LLC and Morningstar classify the Alger Fund as a large-cap growth fund. Currently, approximately 70% of the Alger Fund's portfolio is invested in large-cap stocks. Like the American Century Fund, the Alger Fund's top holdings include NVIDIA, Microsoft, Amazon, and Broadcom.

95.     The Alger Fund's potential rewards are that the fund will generate positive investment returns that outperform the Russell 1000 Growth. The Alger Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

96.     By investing a significant portion of its assets in stocks, including growth-oriented stocks, the Alger Fund, like the American Century Fund, is considered as having a very aggressive risk profile.

97.     The aims, risks, and potential rewards of the Alger Fund are similar to those of the American Century Fund given the similarities in the two funds' investment strategies, the types of stocks the two funds own, and their very aggressive risk profiles.

19

98.     Moreover, both funds are actively managed investment options that seek to outperform relative to the same benchmark, the Russell 1000 Growth. These facts make the Alger Fund a meaningful comparator to the American Century Fund.

### iv.     Comparator 4: Vanguard Russell 1000 Growth Index Fund

99.     The Vanguard Russell 1000 Growth Index Fund (the "Vanguard Fund") is a passively managed index fund that seeks to track the performance of a benchmark index that measures the investment return of large-cap growth stocks in the United States (i.e., the Russell 1000 Growth).

100.    Like the American Century Fund, the Vanguard Fund is available in variable annuity products.

101.    The Vanguard Fund attempts to replicate the Russell 1000 Growth by investing all, or substantially all, of its assets in the stocks that make up the Index, holding each stock in approximately the same proportion as its weighting in the Index.

102.    Currently, approximately 87% of the Vanguard Fund's portfolio is invested in large-cap stocks. Like the American Century Fund, the Vanguard Fund's top holdings include NVIDIA, Microsoft, Apple, Amazon, and Broadcom.

103.    The Vanguard Fund's potential rewards are that it will generate investment returns in line with the Russell 1000 Growth. The Vanguard Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) investing in growth-oriented stocks.

104.    By investing a significant portion of its assets in stocks, including growth-oriented stocks and mid-cap stocks, the Vanguard Fund is considered as having a very aggressive risk profile.

20

105. By virtue of the similarities in their respective market capitalizations, the Vanguard Fund and the American Century Fund share similar aims, rewards, and levels of risk. This makes the Vanguard Fund a meaningful comparator to the American Century Fund.

106. The most telling difference between the American Century Fund and the Vanguard Fund comes from the fees and investment performance. As shown in the table below, the fees of the American Century Fund fees are eight times (8x) the fees of the Vanguard Fund, and as illustrated in Section X below, the Vanguard Fund significantly outperforms the American Century Fund.

| Fund Name | Fees |
|---|---|
| American Century Fund | 0.49% |
| The Vanguard Russell 1000 Growth Index | 0.06% |

**v.      Comparator 5: Russell 1000 Growth Index**

107. American Century Investments has disclosed that the American Century Fund is benchmarked to the Russell 1000 Growth. Empower Retirement, LLC has also disclosed to Plan participants that the Rusell 1000 Growth is the primary benchmark.

108. The Russell 1000 Growth measures the performance of the large-cap growth segment of the U.S. stock market. It includes those Russell 1000 companies that are similar to the companies included in the American Century Fund—large companies with relatively higher price-to-book ratios, higher forecast medium-term growth, and higher sales-per-share historical growth (i.e., growth companies).

109. By virtue of the similarities in their respective market capitalizations, the Russell 1000 Growth and the American Century Fund share similar aims, rewards, and levels of risk,

21

including market risk and issuer risk. This makes the Russell 1000 Growth a meaningful benchmark for the American Century Fund.

## IX.    THE ARTISAN FUND AND ITS COMPARATORS AND BENCHMARK

### A.    Artisan Fund

110.    The Artisan Fund's aim is to seek long-term growth of capital.

111.    The Artisan Fund pursues its aim by investing primarily in a diverse portfolio of U.S. mid-cap companies with growth characteristics.

112.    Artisan Partners has designated the Russell Mid-Cap Growth as one of its benchmarks for the Artisan Fund. Empower Retirement, LLC, the Fund's administrator, also identifies the Russell Mid-Cap Growth as the primary benchmark.

113.    Artisan Partners and Morningstar classify the Artisan Fund as a mid-cap growth fund.

114.    Currently, approximately 68% of the Fund's portfolio is invested in mid-cap stocks.

115.    The Artisan Fund's potential rewards are that it will generate positive investment returns that outperform the Russell Mid-Cap Growth. The Artisan Fund's principal risks are related to (1) market risk, (2) issuer risk, (3) the risks of investing in growth-oriented stocks, and (4) the risks of investing in mid-cap stocks.

116.    By investing a significant portion of its assets in stocks, including growth-oriented stocks and mid-cap stocks, the Artisan Fund is considered as having a very aggressive risk profile.

117.    The Artisan Fund is not the only mid-cap growth fund on the market with the same mix of aims, risks, and potential rewards as described above. As set forth below, there are similar funds that have existed throughout the Class Period.

### i.    Comparator 1: Fidelity Growth Strategies Fund

118.    The Fidelity Growth Strategies Fund (the "Fidelity GS Fund") has similar aims, risks, and potential rewards to those of the Artisan Fund.

119.    Like the Artisan Fund, the Fidelity GS Fund is an actively managed mid-cap growth fund.

120.    The Fidelity GS Fund's aim is to seek capital appreciation. Like the Artisan Fund, the Fidelity GS Fund pursues its aim by investing in mid-cap companies with growth characteristics.

121.    Like the Artisan Fund, the Fidelity GS Fund identifies the Russell Mid-Cap Growth as one of its benchmarks.

122.    Fidelity Investments and Morningstar classify the Fidelity GS Fund as a mid-cap growth fund. Currently, approximately 70% of the Fidelity GS Fund's portfolio is invested in mid-cap stocks.

123.    The Fidelity GS Fund's potential rewards are that the fund will generate positive investment returns that outperform the Russell Mid-Cap Growth. The Fidelity GS Fund's principal risks are related to (1) market risk, (2) issuer risk, (3) the risks of investing in growth-oriented stocks and (4) the risks of investing in mid-cap companies.

124.    By investing a significant portion of its assets in stocks, including growth-oriented stocks and mid-cap stocks, the Fidelity GS Fund, like the Artisan Fund, is considered as having a very aggressive risk profile.

125.    The aims, risks, and potential rewards of the Fidelity GS Fund are similar to those of the Artisan Fund given the similarities in the two funds' investment strategies, the types of stocks the two funds own, and their very aggressive risk profiles.

126.    Moreover, both funds are actively managed investment options that seek to outperform relative to the same benchmark, the Russell Mid-Cap Growth. These facts make the Fidelity GS Fund a meaningful comparator to the Artisan Fund.

### ii.    Comparator 2: Virtus Silvant Mid-Cap Growth Fund

127.    The Virtus Silvant Mid-Cap Growth Fund (the "Virtus Silvant Fund") has similar aims, risks, and potential rewards to those of the Artisan Fund.

128.    Like the Artisan Fund, the Virtus Silvant Fund is an actively managed mid-cap growth fund.

129.    The aim of the Virtus Silvant Fund is to generate long-term capital appreciation.

130.    Like the Artisan Fund, the Virtus Silvant Fund pursues its aim by investing primarily in mid-sized companies with growth characteristics.

131.    Like the Artisan Fund, the Virtus Silvant Fund identifies the Russell Mid-Cap Growth as one of its benchmarks.

132.    Virtas Silvant and Morningstar classify the Virtus Silvant Fund as a mid-cap growth fund. Currently, approximately 76% of the Virtus Silvant Fund's portfolio is invested in mid-cap stocks.

133.    The Virtus Silvant Fund's potential rewards are that the fund will generate positive investment returns that outperform the Russell Mid-Cap Growth. The Virtus Silvant Fund's principal risks are related to (1) market risk, (2) issuer risk, (3) the risks of investing in growth-oriented stocks, and (4) the risks of investing in mid-cap stocks.

134.    By investing a significant portion of its assets in stocks, including growth-oriented stocks and mid-cap stocks, the Virtus Silvant Fund is considered as having a very aggressive risk profile.

135.    The aims, risks, and potential rewards of the Virtus Silvant Fund are similar to those of the Artisan Fund given the similarities in the two funds' investment strategies, the types of stocks the two funds own, and their very aggressive risk profile.

136.    Moreover, both funds are actively managed investment options that seek to outperform relative to the same benchmark, the Russell Mid-Cap Growth. These facts make the Virtus Silvant Fund a meaningful comparator to the Artisan Fund.

### iii.    Comparator 3: T. Rowe Price Diversified Mid-Cap Growth Fund I

137.    The T. Rowe Price Diversified Mid-Cap Growth Fund I (the "T. Rowe Price Fund") has similar aims, risks, and potential rewards to those of the Artisan Fund.

138.    Like the Artisan Fund, the T. Rowe Price Fund is an actively managed mid-cap growth fund.

139.    The aim of the T. Rowe Price Fund is to seek long-term capital growth by investing primarily in the common stocks of mid-cap growth companies.

140.    Like the Artisan Fund, the T. Rowe Price Fund identifies the Russell Mid-Cap Growth as one of its benchmarks.

141.    T. Rowe Price and Morningstar classify the T. Rowe Price Fund as a mid-cap growth fund. Currently 75% of the T. Rowe Price Fund's portfolio is invested in mid-cap stocks.

142.    The T. Rowe Price Fund's potential rewards are that the fund will generate positive investment returns that outperform the Russell Mid-Cap Growth. The T. Rowe Price Fund's principal risks are related to (1) market risk, (2) issuer risk, (3) the risks of investing in growth-oriented stocks, and (4) the risks of investing in mid-cap stocks.

143.    By investing a significant portion of its assets in stocks, including growth-oriented stocks and mid-cap stocks, the T. Rowe Price Fund, like the Artisan Fund, is considered as having a very aggressive risk profile.

144.    The aims, risks, and potential rewards of the T. Rowe Price Fund are similar to those of the Artisan Fund given the similarities in the two funds' investment strategies, the types of stocks the two funds own, and their very aggressive risk profiles.

145.    Moreover, both funds are actively managed investment options that seek to outperform relative to the same benchmark, the Russell Mid-Cap Growth. These facts make the T. Rowe Price Fund a meaningful comparator to the Artisan Fund.

### iv.    Comparator 4: Russell Mid-Cap Growth Index

146.    Artisan Partners has disclosed that the Artisan Fund is benchmarked to the Russell Mid-Cap Growth. The Russell Mid-Cap Growth measures the performance of the mid-cap growth segment of the U.S. stock market. It includes those Russell Mid-Cap companies that are similar to the companies included in the Artisan Fund—those with relatively higher price-to-book ratios, higher forecast medium-term growth, and higher sales-per-share historical growth (i.e., growth companies). Artisan Partners specifically notes in its prospectus that it "continues to use the Russell Mid-Cap Growth as an additional benchmark that Artisan believes more closely reflects the market segments in which the fund invests."

147.    Indeed, by disclosing the Russell Mid-Cap Growth to the public as the appropriate benchmark for the Artisan Fund, Artisan Partners necessarily concludes that the Russell Mid-Cap Growth shares similar aims, risks, and rewards as the Artisan Fund.

148.    This makes the Russell Mid-Cap Growth a meaningful benchmark for the Artisan Fund.

## X.    THE CHALLENGED FUNDS UNDERPERFORMED THEIR BENCHMARKS AND COMPARATOR FUNDS FOR OVER A DECADE

149.    Defendants are required by law to monitor the Plan's investments and remove imprudent ones. They must perform these duties with the skill of a prudent expert.

150.    For a prudent fiduciary, investment options that, on average, underperform their benchmarks over rolling three- or five-year periods are generally candidates for removal. Upon information and belief, such guidelines are often outlined in a plan's investment policy statement.

151.    Had the Stifel Defendants fulfilled their duty with the care and skill of a prudent fiduciary, they would have removed the American Century Fund and the Artisan Fund by the start of the Class Period.

152.    Further, a prudent fiduciary would have realized that the Challenged Funds did not warrant the fees that they were charging for active management.

153.    By early 2020, any fiduciary properly monitoring the Plan would have seen that the circumstances warranted the selection of new options. Yet, Stifel failed to replace the Challenged Funds with any of the many prudent alternatives available on the market.

154.    **Table 1.a** below demonstrates the underperformance of the American Century Fund compared to its benchmark index and to the comparator funds ("Comparator Funds") for the period from January 1, 2014, through February 29, 2020. On average, during this period, the assets of the American Century Fund were around $46,000,000.

155.    **Table 1.a** below compares the investment growth of $46,000,000 invested in the American Century Fund to the growth of $46,000,000 invested in each of the Comparator Funds from January 1, 2014, through February 29, 2020. As the Table shows, participants would have substantially more dollars in retirement savings had Defendants replaced the American Century Fund with any of the Comparator Funds or a fund that more closely matched the Russell 1000

27

Growth. By 2020, any prudent fiduciary would have recognized that the American Century Fund was a terrible encumbrance to the Plan and should have been removed.

**Table 1.a**
**January 1, 2014-February 29, 2020**

| Fund Name | Cumulative Performance | Annualized Performance | Growth of $46 Million |
|---|---|---|---|
| Empower InsPlus-Large Cap Growth / American Century SP | 106.58% | 12.49% | $95,027,728.32 |
| Russell 1000 Growth TR | 113.15% | 13.06% | $98,048,814.91 |
| *+/- American Century* | *-6.57%* | *-0.57%* | *-$3,021,086.59* |
| JPMorgan Large Cap Growth R6 (JLGMX) | 125.08% | 14.06% | $103,535,709.05 |
| *+/- American Century* | *-18.50%* | *-1.57%* | *-$8,507,980.73* |
| Fidelity Blue Chip Growth K (FBGKX) | 122.13% | 13.82% | $102,179,745.48 |
| *+/- American Century* | *-15.55%* | *-1.33%* | *-$7,152,017.16* |
| Alger Focus Equity Y(ALGYX) | 120.57% | 13.69% | $101,461,307.86 |
| *+/- American Century* | *-13.99%* | *-1.20%* | *-$6,433,579.54* |
| Vanguard Russell 1000 Growth Index I (VRGWX) | 112.19% | 12.98% | $97,609,051.20 |
| *+/- American Century* | *-5.61%* | *-0.49%* | *-$2,581,322.88* |
| BlackRock Russell 1000 Growth Fund F | 113.56% | 13.09% | $98,236,000.39 |
| *+/- American Century* | *-6.98%* | *-0.60%* | *-$3,208,272.07* |

156. Yet the Defendants failed to remove the American Century Fund. And the American Century Fund continued to perform poorly throughout the Class Period.

157. **Table 1.b**, below, illustrates the underperformance of the American Century Fund from March 1, 2020, through January 31, 2026, on an annual and cumulative basis relative to the Russell 1000 Growth Index and the Comparator Funds. The American Century Fund underperformed the Russell 1000 Growth Index by nearly 30 percentage points during this period.

**Table 1.b**
**March 1, 2020-January 31, 2026**

| Fund | Annualized Performance | | | | | | | Cumulative Performance |
|---|---|---|---|---|---|---|---|---|
| | 2020* | 2021 | 2022 | 2023 | 2024 | 2025 | YTD | |
| Empower InsPlus-Large Cap Growth / American Century SP | 42.64% | 28.04% | -31.10% | 43.87% | 27.03% | 15.75% | -1.65% | 161.79% |
| Russell 1000 Growth TR | 45.36% | 27.60% | -29.14% | 42.68% | 33.36% | 18.56% | -1.51% | 192.02% |
| *+/- American Century* | *-2.72%* | *0.44%* | *-1.96%* | *1.19%* | *-6.33%* | *-2.81%* | *-0.14%* | *-30.23%* |
| JPMorgan Large Cap Growth R6 (JLGMX) | 58.88% | 18.79% | -25.21% | 34.95% | 34.17% | 14.40% | -1.20% | 188.85% |
| *+/- American Century* | *-16.24%* | *9.25%* | *-5.89%* | *8.92%* | *-7.14%* | *1.35%* | *-0.45%* | *-27.06%* |
| Fidelity Blue Chip Growth K (FBGKX) | 67.05% | 22.81% | -38.40% | 55.76% | 39.80% | 19.99% | -0.08% | 229.89% |
| *+/- American Century* | *-24.41%* | *5.23%* | *7.30%* | *-11.89%* | *-12.77%* | *-4.24%* | *-1.57%* | *-68.10%* |
| Alger Focus Equity Y (ALGYX) | 49.81% | 20.03% | -35.72% | 44.68% | 52.28% | 40.42% | -1.44% | 252.48% |
| *+/- American Century* | *-7.17%* | *8.01%* | *4.62%* | *-0.81%* | *-25.25%* | *-24.67%* | *-0.21%* | *-90.69%* |
| Vanguard Russell 1000 Growth Index I (VRGWX) | 45.28% | 27.52% | -29.17% | 42.65% | 33.25% | 18.49% | -1.51% | 191.05% |
| *+/- American Century* | *-2.64%* | *0.52%* | *-1.93%* | *1.22%* | *-6.22%* | *-2.74%* | *-0.14%* | *-29.26%* |
| BlackRock Russell 1000 Growth Fund F | 45.52% | 27.64% | -29.14% | 42.68% | 33.30% | 18.50% | -1.51% | 192.14% |
| *+/- American* | *-2.88%* | *0.40%* | *-1.96%* | *1.19%* | *-6.27%* | *-2.75%* | *-0.14%* | *-30.35%* |

| *Century* | | | | | | | |
|---|---|---|---|---|---|---|---|

*Investment performance from March 1, 2020

| Underperformed by < 2% |
| Underperformed by ≥ 2% |
| Underperformed by ≥ 4% |
| Underperformed by ≥ 6% |

158.    The annualized performance numbers in **Table 1.b** highlight the overall underperformance of the American Century Fund. Though the American Century Fund occasionally outperformed its benchmark and certain Comparator Funds, that outperformance was overshadowed by the multiple years in which the American Century Fund underperformed its benchmark and Comparator Funds. The magnitude of this underperformance is captured by the cumulative numbers in **Table 1.b**. Overall, the American Century Fund remained an imprudent investment for the Plan.

159.    Together, **Tables 1.a** and **1.b** capture the depth and the breadth of the American Century Fund's underperformance relative to meaningful benchmarks that has persisted for more than twelve years.

160.    All the data presented in each of the above **Tables 1.a** and **1.b** was available in real time to the Stifel Defendants throughout the Class Period.

161.    Defendants' failure to remove the American Century Fund cost Plan participants millions of dollars in retirement savings. On average, during the period from January 1, 2020, through August 31, 2025, the assets of the American Century Fund were around $117,000,000. **Table 1.c** below compares the investment growth of $117 million invested in the American Century Fund to the growth of $117,000,000 invested in each of the Comparator Funds from March 1, 2020, through January 31, 2026. As the Table shows, Participants would have substantially more dollars in retirement savings had Defendants replaced the American Century

30

Fund with any of the Comparator Funds or a fund that more closely matched the Russell 1000 Growth Index.

**Table 1.c**
**March 1, 2020-January 31, 2026**

| Fund Name | Cumulative Performance | Annualized Performance | Growth of $117 Million |
|---|---|---|---|
| Empower InsPlus-Large Cap Growth / American Century SP | 161.79% | 17.66% | $306,289,887.76 |
| Russell 1000 Growth TR | 192.02% | 19.86% | $341,662,959.02 |
| *+/- American Century* | *-30.23%* | *-2.20%* | *-$35,373,071.26* |
| JPMorgan Large Cap Growth R6 (JLGMX) | 188.85% | 19.64% | $337,957,955.83 |
| *+/- American Century* | *-27.06%* | *-1.98%* | *-$31,668,068.07* |
| Fidelity Blue Chip Growth K (FBGKX) | 229.89% | 22.35% | $385,975,103.20 |
| *+/- American Century* | *-68.10%* | *-4.69%* | *-$79,685,215.44* |
| Alger Focus Equity Y(ALGYX) | 252.48% | 23.73% | $412,403,511.42 |
| *+/- American Century* | *-90.69%* | *-6.07%* | *-$106,113,623.66* |
| Vanguard Russell 1000 Growth Index I (VRGWX) | 191.05% | 19.79% | $341,809,325.90 |
| *+/- American Century* | *-29.26%* | *-2.13%* | *-$35,519,438.14* |
| BlackRock Russell 1000 Growth Fund F | 192.14% | 19.87% | $340,531,420.83 |
| *+/- American Century* | *-30.35%* | *-2.21%* | *-$34,241,533.07* |

162.    **Table 2.a** below demonstrates the underperformance of the Artisan Fund compared to its benchmark index and to the Comparator Funds for the six-year period from January 1, 2014, through February 29, 2020. On average, during this period, the assets of the Artisan Fund were around $35 million.

163.    **Table 2.a** below compares the investment growth of $35,000,000 invested in the Artisan Fund to the growth of $35 million invested in each of the Comparator Funds from January 1, 2014, through February 29, 2020. As the Table shows, Participants would have substantially

more dollars in retirement savings had Defendants replaced the Artisan Fund with any of the Comparator Funds or a fund that more closely matched the Russell Mid-Cap Growth Index. By 2020, any prudent fiduciary would have recognized that the Artisan Fund was a terrible encumbrance to the Plan and should have been removed.

**Table 2.a**
**January 1, 2014-February 29, 2020**

| Fund Name | Cumulative Performance | Annualized Performance | Growth of $35 Million |
|---|---|---|---|
| Empower Ins-Mid-Cap Growth / Artisan SP | 73.53% | 9.35% | $60,737,117.60 |
| Russell Mid Cap Growth TR | 82.07% | 10.21% | $63,725,359.38 |
| *+/- Artisan* | *-8.54%* | *-0.86%* | *-$2,988,241.78* |
| Fidelity Growth Strategies K (FAGKX) | 80.01% | 10.00% | $63,003,250.04 |
| *+/- Artisan* | *-6.48%* | *-0.65%* | *-$2,266,132.44* |
| Virtus Silvant Mid-Cap Growth Inst (DRMCX) | 82.80% | 10.28% | $63,981,727.55 |
| *+/- Artisan* | *-9.27%* | *-0.93%* | *-$3,244,609.95* |
| T. Rowe Price Diversified Mid Cap Gr (RPTTX) | 90.83% | 11.05% | $66,789,270.29 |
| *+/- Artisan* | *-17.30%* | *-1.70%* | *-$6,052,152.69* |

164.    Yet the Defendants failed to remove the Artisan Fund. And the Artisan Fund continued to perform poorly throughout the Class Period.

165.    **Table 2.b**, below, illustrates the underperformance of the Artisan Fund from March 1, 2020, through January 31, 2026, on an annual and cumulative basis relative to the Russell Mid-Cap Growth and the Comparator Funds. The Artisan Fund underperformed the Russell Mid-Cap Growth by over 15% during this period.

**Table 2.b**
**March 1, 2020-January 31, 2026**

| Fund | Annualized Performance | | | | | | | Cumulative Performance |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2020* | 2021 | 2022 | 2023 | 2024 | 2025 | YTD | |
| Empower Ins-Mid Cap Growth / Artisan SP | 60.11% | 10.84% | -36.56% | 24.55% | 12.69% | 15.25% | 0.42% | 82.87% |
| Russell Mid Cap Growth TR | 44.28% | 12.73% | -26.72% | 25.87% | 22.10% | 8.66% | -0.87% | 97.30% |
| +/- Artisan | 15.83% | -1.89% | -9.84% | -1.32% | -9.41% | 6.59% | 1.29% | -14.43% |
| Fidelity Growth Strategies K (FAGKX) | 35.17% | 21.55% | -26.41% | 21.07% | 26.68% | 12.71% | 0.10% | 109.20% |
| +/- Artisan | 24.94% | -10.71% | -10.15% | 3.48% | -13.99% | 2.54% | 0.32% | -26.33% |
| Virtus Silvant Mid-Cap Growth Inst (DRMCX) | 59.28% | 15.89% | -32.59% | 24.81% | 20.49% | 18.12% | 1.01% | 123.27% |
| +/- Artisan | 0.83% | -5.05% | -3.97% | -0.26% | -7.80% | -2.87% | -0.59% | -40.40% |
| T. Rowe Price Diversified Mid Cap Gr (RPTTX) | 41.52% | 13.88% | -24.48% | 21.04% | 23.95% | 10.54% | -0.21% | 101.42% |
| +/- Artisan | 18.59% | -3.04% | -12.08% | 3.51% | -11.26% | 4.71% | 0.63% | -18.55% |

*Investment performance from March 1, 2020

| |
| --- |
| Underperformed by < 2% |
| Underperformed by ≥ 2% |
| Underperformed by ≥ 4% |
| Underperformed by ≥ 6% |

166.    The annualized performance numbers in **Table 2.b** highlight the overall underperformance of the Artisan Fund. Though the Artisan Fund occasionally outperformed its benchmark and certain Comparator Funds, that outperformance was overshadowed by the multiple years in which the Artisan Fund underperformed its benchmark and Comparator Funds. The

33

magnitude of this underperformance is captured by the cumulative numbers in **Table 2.b**. Overall, the Artisan Fund remained an imprudent investment for the Plan.

167. Together, **Tables 2.a** and **2.b** capture the depth and the breadth of the Artisan Fund's underperformance relative to meaningful benchmarks that has persisted for more than twelve years.

168. All the data presented in each of the above **Tables 2.a** and **2.b** was available in real time to the Stifel Defendants throughout the Class Period.

169. Defendants' failure to remove the Artisan Fund cost Plan participants millions of dollars in retirement savings. On average, during the period from January 1, 2020, through August 31, 2025, the assets of the Artisan Fund were around $70,000,000. **Table 2.c** below compares the investment growth of $70,000,000 invested in the Artisan Fund to the growth of $70,000,000 invested in each of the Comparator Funds from March 1, 2020, through January 31, 2026. As the Table shows, Participants would have substantially more dollars in retirement savings had Defendants replaced the Artisan Fund with any of the Comparator Funds or a fund that more closely matched the Russell Mid-Cap Growth Index.

**Table 2.c**
**March 1, 2020-January 31, 2026**

| Fund Name | Cumulative Performance | Annualized Performance | Growth of $70 Million |
|---|---|---|---|
| Empower Ins-Mid Cap Growth / Artisan SP | 82.87% | 10.74% | $128,006,990.13 |
| Russell Mid Cap Growth TR | 97.30% | 12.17% | $138,108,259.30 |
| *+/- Artisan* | *-14.43%* | *-1.43%* | *-$10,101,269.17* |
| Fidelity Growth Strategies K (FAGKX) | 109.20% | 13.29% | $146,439,569.02 |
| *+/- Artisan* | *-26.33%* | *-2.55%* | *-$18,432,578.89* |
| Virtus Silvant Mid-Cap Growth Inst (DRMCX) | 123.27% | 14.54% | $156,287,619.83 |
| *+/- Artisan* | *-40.40%* | *-3.80%* | *-$28,280,629.70* |

| T. Rowe Price Diversified Mid Cap Gr (RPTTX) | 101.42% | 12.56% | $140,992,447.15 |
|---|---|---|---|
| *+/- Artisan* | *-18.55%* | *-1.82%* | *-$12,985,457.02* |

170.    The Comparator Funds listed in each of the above Tables are managed by reputable investment advisers with significant assets under management and are available to all large retirement plans, including Stifel's Plan. Stifel would not have had to scour the market to find them.

171.    Defendants owed a fiduciary duty to remove the Challenged Funds within a reasonable time after they manifested poor performance. Yet they retained the Challenged Funds year after year, even though they consistently failed their objectives. Any prudent fiduciary would have appreciated the overall depth of the Challenged Funds' underperformance and removed them by the start of the Class Period. No prudent fiduciary would have retained the Challenged Funds, like Stifel has, throughout the Class Period.

## XI.    CLASS ACTION ALLEGATIONS

172.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a). Plaintiff brings this suit in a representative capacity on behalf of the Plan and its participants and beneficiaries pursuant to 29 U.S.C. § 1132(a), seeking appropriate Plan-wide relief under 29 U.S.C § 1109 to protect the interests of the Plan.

173.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to a direct individual action on behalf of the Plan under 29 U.S.C. § 1132(a)(2), Plaintiff seeks to certify this action as a class action on behalf of participants and beneficiaries of the Plan. Specifically, Plaintiff seeks to certify, and to be appointed as representatives of, the following classes:

a. All participants and beneficiaries of the Plan who invested in the American Century Fund from February 20, 2020, through the date of judgment, excluding the Stifel Defendants, any of their directors, and any officers or employees of the Stifel Defendants with responsibility for the Plan's investment or administrative function.

b. All participants and beneficiaries of the Plan who invested in the Artisan Fund from February 20, 2020, through the date of judgment, excluding the Stifel Defendants, any of their directors, and any officers or employees of the Stifel Defendants with responsibility for the Plan's investment or administrative function.

174.    This action meets the requirements of Federal Rule of Civil Procedure 23 and is certifiable as a class action for the following reasons:

a. The Class includes thousands of members and is so large that joinder of all its members is impracticable.

b. There are numerous questions of law and fact common to this Class because the Stifel Defendants owed the same fiduciary duties to the Plan and to all participants and beneficiaries and took a common course of actions and omissions as alleged herein as to the Plan, and not as to any individual participant, that affected all Class members through their participation in the Plan in the same way. Thus, questions of law and fact common to the Class include, without limitation, the following: (i) whether each of the Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a); (ii) whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by employing an imprudent process for monitoring and evaluating Plan investment options; (iii) whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by retaining an imprudent investment for an

36

unreasonable amount of time; (iv) whether Plaintiff's claims of an imprudent process require similar inquiries and proof of the claims, and therefore implicate the same set of concerns, for all proposed members of the Class; (iv) what are the losses to the Plan resulting from each breach of fiduciary duty; and (v) what Plan-wide equitable and other relief the Court should impose in light of the Stifel Defendants' breach of duties.

c. Plaintiff's claims are typical of the claims of the Class because Plaintiff was a Plan participant who invested in the Challenged Funds during the Class Period, and all participants in the Plan who invested in the Challenged Funds were harmed by the Stifel Defendants' misconduct.

d. Plaintiff is an adequate representative of the Class because Plaintiff participated in the Plan during the Class Period, invested in the Challenged Funds, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e. There are no substantial individualized questions of law or fact among Class members on the merits of this action.

175.  Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Stifel Defendants in respect to the discharge of their fiduciary duties to the Plan and their personal liability to the Plan under 29 U.S.C. § 1109(a). Moreover, adjudications by individual participants and beneficiaries regarding the alleged breaches of fiduciary duties, and remedies for the Plan would, as a practical matter, be

dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

176. Additionally, or in the alternative, certification under Rule 23(b)(2) is appropriate because the Stifel Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. Plaintiff seeks reformation of the Plan to include only prudent investments, which will benefit them and other Plan participants.

177. Additionally, or in the alternative, this action may be certified as a class under Rule 23(b)(3). A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and it is impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no Class member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.

178. Additionally, or alternatively, this action may be certified as to particular issues under Rule 23(c)(4), including but not limited to the Defendants' liability to the Class for their allegedly imprudent conduct.

179. Plaintiff's counsel will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

## CAUSES OF ACTION

## COUNT I

**Breach of Duty of Prudence by Mismanaging and Failing to Remove Imprudent Investments from the Plan Within a Reasonable Time**
**(Violation of ERISA, 29 U.S.C. § 1104)**
**(Against All Stifel Defendants)**

180.    All allegations set forth in the Complaint are realleged and incorporated herein by reference.

181.    At all relevant times during the Class Period, the Stifel Defendants acted as fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A) by exercising authority and control with respect to the management of the Plan and its assets, and/or by rendering investment advice or by having authority or responsibility to render investment advice to the Plan, and/or were designated in the governing Plan documents as a named fiduciary within the meaning of 29 U.S.C. § 1102(a).

182.    29 U.S.C. § 1104(a)(1)(B) requires a plan fiduciary to act with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

183.    Thus, under ERISA, the Stifel Defendants are responsible for evaluating and monitoring the Plan's investments on an ongoing basis, eliminating imprudent investments, and taking all necessary steps to ensure the Plan's assets are invested prudently.

184.    The Stifel Defendants breached their fiduciary duties through an imprudent process for investigating, evaluating, and monitoring investments. The faulty process resulted in a Plan that included and retained the Challenged Funds which suffered poor performance relative to their relevant benchmark indexes and Comparator Funds.

39

185.    By failing to replace the Challenged Funds, the Stifel Defendants failed to discharge their duties with the care, skill, prudence, and diligence that a prudent fiduciary acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

186.    The Stifel Defendants' breach of fiduciary duty has substantially impaired the Plan's use, its value, and its investment performance for all Class members.

187.    As a direct and proximate result of the Stifel Defendants' breaches of fiduciary duty, the Plan has suffered millions of dollars of damages which continue to accrue and for which the Stifel Defendants are jointly and severally liable pursuant to 29 U.S.C. §§ 1132(a)(2) and 1109(a).

188.    Each of the Stifel Defendants is liable to make good to the Plan any losses resulting from the aforementioned breaches and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. The Stifel Defendants are also subject to other Plan-wide equitable or remedial relief as appropriate, including an injunction and the removal of fiduciaries.

189.    Each Stifel Defendant also participated in the breach of the other Stifel Defendants, knowing that such acts were a breach, and enabled the other Stifel Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties. Each Stifel Defendant knew of the breach by the other Stifel Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Stifel Defendant is liable for any losses caused by the breach of its co-fiduciary duties under 29 U.S.C. § 1105(a).

190.    Plaintiff respectfully prays that this Court enter judgment in the Plan's favor and against Defendants, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

## COUNT II

### Failure to Monitor
### (Against All Stifel Defendants)

191.    All allegations set forth in the Complaint are realleged and incorporated herein by reference.

192.    The Stifel Defendants had a duty to monitor the performance of each party to whom they delegated any fiduciary responsibilities. A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

193.    To the extent any of the Stifel Defendants' fiduciary responsibilities were delegated to another fiduciary, the Stifel Defendants' monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently, loyally, and in compliance with governing Plan documents.

194.    The Stifel Defendants breached their fiduciary monitoring duties by, among other things:

    a.    failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' actions and omissions in violation of ERISA;

    b.    failing to monitor their appointees' fiduciary process;

    c.    failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating and ensuring that investment options were prudent; and

    d.    failing to remove appointees whose performance was inadequate in that they continued to allow investment options that were imprudent and otherwise violated

41

ERISA to remain in the Plan, to the detriment of Plan participants' retirement savings.

195. Each fiduciary who delegated its fiduciary responsibilities likewise breached its fiduciary monitoring duty by, among other things:

a. failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' actions and omissions in violation of ERISA;

b. failing to monitor their appointees' fiduciary process;

c. failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating and ensuring that investment options were prudent; and

d. failing to remove appointees whose performance was inadequate in that they continued to allow investment options that were imprudent and otherwise violated ERISA to remain in the Plan, to the detriment of Plan participants' retirement savings.

196. As a direct result of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had Stifel and the other delegating fiduciaries discharged their fiduciary monitoring duties, the Plan would not have suffered these losses.

197. Plaintiff respectfully prays that this Court enter judgment in the Plan's favor and against Defendants, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

### JURY TRIAL DEMANDED

198. Pursuant to Federal Rule of Civil Procedure 38 and the Constitution of the United States, Plaintiff respectfully demands a trial by jury.

**PRAYER FOR RELIEF**

For these reasons, Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

i.   find and adjudge that the Stifel Defendants have breached their fiduciary duties, as described above;

ii.  find and adjudge that the Stifel Defendants are personally liable to make good to the Plan any losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duties;

iii. order the Stifel Defendants to make good to the Plan the losses resulting from each breach of fiduciary duty and to restore to the Plan any profits resulting from each breach of fiduciary duty;

iv.  find and adjudge that the Stifel Defendants are liable to the Plan for appropriate Plan-wide equitable relief, including but not limited to restitution and disgorgement;

v.   determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

vi.  order the Stifel Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a);

vii. remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

viii. impose surcharge against the Stifel Defendants and in favor of the Plan all amounts involved in any transactions or fiduciary breaches that were in violation of ERISA;

ix.    reform the Plan to include only prudent investments;

x.    certify the Class, appoint the Plaintiff as class representative, appoint Sanford Heisler Sharp McKnight, LLP as Class Counsel, and appoint Charles Field and Sharon Kim as lead counsel for the Class;

xi.    award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

xii.    order the Stifel Defendants to pay interest to the extent allowed by law; and

xiii.    grant such other equitable or remedial relief as the Court deems appropriate.

Dated: February 20, 2026                Respectfully submitted,

**KEENAN & BHATIA, LLC**

_____
Edward Emmett Bhatia ("E.E.") Keenan #62993(MO)
4625 Lindell Blvd., Ste. 200
St. Louis, MO 63108
Telephone: (314) 987-2273
ee@keenanfirm.com

Charles Field*
**SANFORD HEISLER SHARP MCKNIGHT, LLP**
7911 Herschel Avenue, Suite 300
La Jolla, CA, 92037
Telephone: (619) 577-4252
Facsimile: (619) 577-4250
cfield@sanfordheisler.com

Sharon Kim*
**SANFORD HEISLER SHARP MCKNIGHT, LLP**
17 State Street, 37th Floor
New York, NY 10004
Telephone: (646) 402-5660
sharonkim@sanforheisler.com

Attorneys for Plaintiff
* Admission *pro hac vice* forthcoming

44